IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| LAMIKCO TWANET MAGEE | |
| Plaintiff, | |
| v. | Civil Action No.: 3:24-cv-30049-MGM |
| AMHERST-PELHAM REGIONAL PUBLIC SCHOOLS and individually MICHAEL MORRIS, and DOREEN CUNNINGHAM, and DOUGLAS SLAUGHTER | Leave to File Granted on: July 11, 2024 |
| | Jury Trial Demanded |
| Defendants. | |

## SECOND AMENDED COMPLAINT

1. Plaintiff Lamikco Twanet Magee brings this action to hold Amherst Pelham Regional Public Schools ("ARPS") and its leadership accountable for discriminating and retaliating against her in violation of multiple federal and state laws.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Ms. Magee's federal-law claims pursuant to 28 U.S.C. §§ 1331 and 1343.

1

3.    This Court has subject matter jurisdiction over Ms. Magee's state-law claims
pursuant to 28 U.S.C. § 1367(a).

4.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants
conduct business in this District and Division, because a substantial part of
the events giving rise to Ms. Magee's claims occurred in this District and
Division, and because Defendants are all subject to the Court's personal
jurisdiction in this District.

**PARTIES**

5.    Ms. Magee is an African-American woman, a decorated and disabled United
States Air Force veteran, and an accomplished, well-credentialed school
teacher with decades of experience in public education.  Since 2016, she has
been employed at Amherst Regional Middle School, which is part of
Defendant Amherst-Pelham Regional Public Schools ("ARPS").  She is
currently the Dean of Students there, although she has not been given the
administrator position that should accompany that title.

6.    Defendant ARPS is a municipal school district responsible for administering
a public school system operating in Amherst, Massachusetts.

7.    Defendant Michael Morris was the Superintendent of ARPS from 2016 until
September 2023.

8.    Defendant Douglas Slaughter has been the Director of Finance for ARPS since 2020.   Since September 2023, he has also been the Interim Superintendent at ARPS.

9.    Defendant Doreen Cunningham was Assistant Superintendent of Diversity, Equity, Inclusion and Human Resources at ARPS from 2016 until October 13, 2023.

## BACKGROUND

*Ms. Magee is an exemplary educator who has worked hard to build a sterling resume.*

10.    After being honorably discharged from the Air Force following a decorated career, Ms. Magee began her teaching career in 2000, working as a computer instructor at Wayne Community College in North Carolina.

11.    In 2002, she continued her teaching career first as a substitute teacher in Fulton County, Georgia then as a special education teacher at Pebblebrook High School in Mableton, and then as a special education teacher at McNair Middle School in Fulton County.

12.    In 2009, Ms. Magee began teaching at Putnam Vocational High School in Springfield, Massachusetts, where she again taught special education.

13.    In 2016, Ms. Magee began working as a special education teacher at ARPS. Although she had planned to resume teaching in Georgia later that year, her sister became seriously, and then terminally ill, leading Ms. Magee to

relocate permanently to Massachusetts so she could care for her sister and raise her sister's five children and grandchild.

14.    By the time she began working at Amherst Regional Middle School, Ms. Magee boasted a resume that could rival that of nearly any experienced educator in the country.   She had earned an associate degree from the University of South Carolina, a bachelor's degree from American Intercontinental University, a master of education degree from American International College, and a law degree from Western New England University.   She had been on the steering committee for UCORE (the national caucus of educators); held several roles in the Massachusetts Teachers Association; served as textbook reviewer for a publisher; presented at education conferences across the United States and even in Ghana; and been designated by the United States Department of Education to participate in a Fulbright-Hays project in Tanzania.   She was—and is—a superlative educator.

15.    Ms. Magee's teaching has focused almost entirely on special education, a notoriously demanding and under-resourced field.   Ms. Magee teaches special education because, throughout her life, she has made it her mission to help people with the greatest needs.

16.  In Massachusetts, a disproportionate number of students assigned to special needs programs are black and Latino, despite evidence showing that such students are less likely to be identified as learning-disabled when matched with black or Latino teachers.[1]  Ms. Magee's work with and advocating on behalf of students in special education programs inevitably intersects or overlaps with issues of racial fairness in the education system.

17.  Ms. Magee spoke out effectively on behalf of ARPS students and faculty.

18.  In September 2016, Ms. Magee resumed working full time as a special education teacher at Amherst Regional Middle School ("the School").

19.  After commencing full-time employment at the School, Ms. Magee repeatedly spoke out against Defendants' failures to address discrimination complaints.  She filed grievances for violations of collective bargaining agreements, and unfair-labor-practice charges.

20.  In 2019, for example, Ms. Magee filed a grievance alleging racial discrimination in the School's special education department, and another grievance alleging hostile working conditions for employees of color.  The latter grievance was escalated to the School's Joint Labor Management Committee.

---

[1] *See, e.g.*, www.cbsnews.com/boston/news/black-kids-black-teacher-learning-disability-unc-uc-davis/.

21.  In 2020, Ms. Magee's reputation for standing up for her colleagues and for students earned her election as president of the Amherst-Pelham Education Association ("APEA"), the teacher's union at ARPS.

22.  As union president, Ms. Magee participated in contentious labor negotiations against ARPS.  Ms. Cunningham was one of the School's representatives, across the table from Ms. Magee, during those negotiations.  Ms. Magee was subsequently involved with other efforts to vindicate APEA members' rights, including an ongoing arbitration involving a different ARPS school for retaliating against protected union activity.

23.  As president of APEA, Ms. Magee was a determined advocate, filing grievances and complaints on behalf of her colleagues and ARPS students to address various forms of unlawful discrimination and retaliation.

24.  A number of Ms. Magee's complaints were substantiated by outside investigators.  One of them prompted an investigation by the United States Department of Education's Office of Civil Rights.  And they culminated in the APEA agreeing to a vote of no confidence in Defendant Michael Morris and in Ms. Cunningham, based on a determination that both had engaged in discrimination and unethical hiring practices.

25.  Defendants all took notice that Ms. Magee had become a thorn in their collective sides due her protected activity.  They took notice because they

were sometimes the recipients of the complaints she lodged, and sometimes the subjects of those complaints.

26.   Ms. Magee's complaints reflected poorly on ARPS and addressing them meant more work for ARPS, Ms. Cunningham, and Defendants Michael Morris and Douglas Slaughter.

27.   In response to Ms. Magee's protected activity, Defendants retaliated against Ms. Magee by denying her promotion to positions for which she was the most qualified applicant.   Defendants took a litany of adverse employment actions against her when they defamed her, and created a hostile work environment for her—all because she spoke out against Defendants' disregard of their legal obligations.

28.   Defendants also retaliated against Ms. Magee for her protected advocacy by denying her meetings with school officials with whom she needed to meet in order to perform her required job duties.

29.   Defendants further retaliated against Ms. Magee's protected advocacy in March 2022 by posting her position as the School's curriculum leader for special education.   They did so with the aim of hiring Patrick Hunter, a white man, in the role, despite Mr. Hunter being demonstrably less qualified than Ms. Magee.

30. Also in May 2022, Defendants retaliated against Ms. Magee by rejecting her application to serve as the School's program administrator for special education. They did so despite there being no similarly well-qualified applicant for the position, and simply because they wanted to punish Ms. Magee for speaking out.

31. In September 2022, Ms. Magee emailed one of the School's administrators, Jennifer Ortiz, regarding the School's decision to hire an unqualified teacher, Nancy Stewart, to serve as the education team leader responsible for leading Individualized Education Program meetings at the School.

32. Ms. Stewart was not a licensed teacher and had been named in a substantiated complaint Ms. Magee had previously filed.

33. Defendants hired Ms. Stewart despite Ms. Magee, a qualified and licensed teacher, being in the applicant pool, and despite an official policy that licensed teachers were to be preferred over unlicensed teachers for education team leader roles.

34. On information and belief, Defendants hired Ms. Stewart because she was close friends with another school administrator, JoAnn Smith, and because they believed she would not call out shortcomings the way Ms. Magee would.

8

35.   In early 2023, Defendants posted a job opening to serve as principal at the School.  Ms. Magee applied.

36.   In March 2023, Ms. Magee learned she had not been selected as a finalist for the principal position and that, instead, two other people had been selected.

37.   The two people selected as finalists were both from outside the School and, on information and belief, scored lower than Ms. Magee on ARPS' assessment protocol.  Both ultimately declined the position.

38.   In April 2023, Ms. Magee emailed Mr. Morris indicating that she had proof the scores had been tallied incorrectly, that at least one feedback form for her had not been received or counted as part of that process, and that she was being retaliated against for her advocacy.

39.   Even after Ms. Magee was denied the opportunity to be a finalist for the principal position, her colleagues continued to advocate for her.  For instance, Alicia Lopez repeatedly emailed Mr. Morris urging him to make Ms. Magee a part of the finalist pool and urging him to appoint Ms. Magee as the School's interim principal.

40.   Mr. Morris and the other Defendants took no action in response to those communications from Ms. Magee and Ms. Lopez.

41. Ms. Magee was ultimately denied the principal position despite being qualified for the position and despite there being no other qualified candidate for it.

42. In May 2023, Ms. Cunningham submitted a statement to the School Committee describing the School's "failed principal search." The statement referred to Ms. Magee as "a woman scorned" by having not obtained the position. The statement disparagingly referred to Ms. Magee as having "quite an agenda," before denouncing her for having "rallied the membership, the community, and families because she did not become the principal of the middle school."

43. The antipathy to Ms. Magee, from Ms. Cunningham's statements, was clear. The unmistakable goal was to humiliate Ms. Magee and portray her as a sore loser seeking to mislead the community about ARPS and the School.

44. Ms. Cunningham's statement was all the more troubling because ARPS (and its agents) and Ms. Cunningham were all bound by a contract in which they pledged confidentiality with respect to, among other things, Ms. Magee's candidacy for the principal position. (See Ex B - Confidentiality Agreement).

45. Ms. Magee was, herself, a third-party beneficiary of that contract, because the parties to it—including ARPS and Ms. Cunningham—had agreed to the non-disclosure provision to benefit applicants like Ms. Magee.

46. But, in violation of that contract, Ms. Cunningham disclosed Plaintiff's confidential personnel records at the meeting, including the fact that she had applied for the principal position and the evaluative scoring results for that position.

47. On information and belief, Ms. Cunningham and ARPS disclosed that information about Ms. Magee in a malicious attempt to embarrass and discredit Ms. Magee's advocacy against ARPS' discriminatory and retaliatory practices.

48. In May 2023, Ms. Magee applied for a position as education team leader for the School's special education program, a position that had been open for months.

49. Ms. Magee was the only qualified internal candidate to apply for the position.

50. Instead of hiring Ms. Magee, ARPS and Mr. Slaughter filled the position with an interim candidate from outside the School.  That candidate soon left the position and, when it opened up again, Ms. Magee was again not offered the role, despite there being no other qualified applicant for it.

51. Defendants again did not offer Ms. Magee the role because they were angry at her for engaging in protected petitioning activity concerning racial discrimination, unlawful retaliation, and numerous other violations of legally protected interests at the School.

52.  In September 2023, Ms. Magee applied for the open position of dean of students at the School.  The posting for the position indicated that it was an administrator position.

53.  Ms. Magee was the only person at the School to apply for the position and ARPS and Slaughter were eventually forced to place her in that position. However, in retaliation for her speech on education and workplace issues, ARPS and Slaughter denied her promotion to administrator, denying her the benefits such a promotion entails.

### *ARPS and its leadership have engaged in a pattern or practice of similar misconduct by discriminating against other staff members who engaged in protected speech.*

54.  ARPS has similarly discriminated against other staff members who engaged in protected speech.

55.  For example, on October 11, 2021, ARPS placed another staff member, Lani Blechman, on retaliatory administrative leave after learning that she was organizing a no confidence vote to protest the discriminatory treatment of staff of color at Fort River Elementary School.  After successfully grieving the retaliatory administrative leave, with Ms. Magee's assistance, an arbitrator determined that the district violated constitutional principles of due process by placing Blechman on administrative leave for reasons that were unsubstantiated claims.

56.   Shortly after Lewis Algarin complained about the retaliation and discrimination in April 2023, he was subsequently given a negative performance review, denied sick bank leave, and had his email access revoked.  After successfully grieving these retaliatory adverse actions, with Ms. Magee's assistance, the negative review was removed, his sick bank leave was granted, and his email access was ultimately restored, but the retaliatory message was clear.

57.   The cases of Ms. Blechman and Mr. Algarin are just two illustrations among many others of instances where ARPS and its leadership have retaliated against employees for speaking out on behalf of their own rights and the rights of their colleagues and students.  The response from ARPS and its leadership is by now so familiar, predictable, and well-settled that many staff simply expect adverse employment action if they speak up about misconduct or maladministration by ARPS and its leadership.  Ms. Magee's case is far from an isolated incident.

### Doreen Cunningham publishes a defamatory flyer about Ms. Magee, then Douglas Slaughter republishes it online.

58.   Defendants' antipathy to Ms. Magee is evident from statements they published during her time at the School.

59.   Ms. Cunningham's May 2023 statement that Ms. Magee was "a woman scorned," who had "quite an agenda" and had "rallied the membership, the

community, and families because she did not become the principal of the middle school," was just one instance of her going out of her way to publicly disparage Ms. Magee.

60. On May 14, 2023, Ms. Cunningham told a colleague that, "Stuff going to come down about Meka [Ms. Magee]."

61. On May 16, 2023, the ARPS committee held an emergency meeting at the School library.

62. According to an investigative report commissioned by ARPS itself, on the day of the meeting, Ms. Cunningham asked an ARPS employee ("Employee 1") to view a document on her computer. That document turned out to be a flyer that Ms. Cunningham intended to disseminate later that evening at the committee meeting. (Ex. C at p 47 ¶ 95)

63. The flyer made numerous false allegations about Ms. Magee, including that she had a criminal record and had been part of a cheating scandal in Atlanta, Georgia.

64. After reading the accusations in the flyer, Employee 1 asked Ms. Cunningham, "Is that true?" Ms. Cunningham responded, "Yes."

65. On information and belief, Ms. Cunningham knew she had no basis for the allegations she made about Ms. Magee in the flyer, but she made them anyway—and represented that they were factual—because she was fed up

14

with Ms. Magee's protected speech about discrimination and retaliation at the School

66.  The flyer also made allegations that two other employees at the School practiced witchcraft.

67.  After reading those allegations, Employee 1 told Ms. Cunningham, "What! You cannot say that."  Ms. Cunningham responded, "It's true." (Ex. C at p 47 ¶ 95)

68.  Ms. Cunningham told Employee 1 she was going to send the flyer to the School printer and asked Employee 1 to pick up the copies.  Employee 1 responded, "You can't," meaning Ms. Cunningham was not permitted to print the document using the School's equipment.  (Ex. C at p 47 ¶ 95)

69.  Ms. Cunningham replied, "You're right, I will get them printed at Staples." (Ex. C at p 48 ¶ 95)

70.  Cunningham admitted that the flyer was on her work computer hard drive and that she showed it to the coworker, but Cunningham refused to disclose who helped her create it.  Cunningham acknowledged that Employee No. 1 told her not to print it using the school's printer.  Cunningham stated she took responsibility for printing it. (Ex. C at p 48 ¶ 96)

71.  Ms. Cunningham disseminated her flyer at the May 16, 2023 committee meeting, which was attended in-person by more than 50 community

members, while another 141 followed the proceedings on an online simulcast.  According to ARPS' independent investigation, attendees at the meeting were handed copies of the flyer or found it under the windshield wipers of their cars.

72.  A copy of the flyer is attached to this Complaint as part of Exhibit C.  (*See* Ex C - Edward R Mintnick's Investigative Report at p 44 at ¶ 89.)

73.  The flyer also contains the false allegations that two other employees at the School engaged in witchraft, which further shows how unmoored from facts it is.

74.  An independent investigator subsequently determined "that a reasonable person would find the flyer's allegations about Ms. Magee to be highly disrespectful, hostile, and possibly defamatory.  (Ex. C at p. 47 ¶ 94) Notably, the investigator's report does not clearly state that the allegations about Ms. Magee were false.

75.  The investigator asked Ms. Cunningham about a statement in the flyer claiming that Ms. Magee had her record as a teacher in Georgia sealed.  The only response Ms. Cunningham could muster was that, "It's information on the internet. I saw info on the internet. I don't know if it's true."

76.   The investigator looked online for any information referencing Plaintiff being involved in the Atlanta teacher cheating scandal and could not find any such information.  (Ex. C at p 48 ¶ 96)

77.   The flyer also alleged that Ms. Magee had been "chased out of Springfield for unethical behaviors."  When the investigator pressed Ms. Cunningham on the source of that allegation or any documentary support for it, she was unwilling to identify the source and could not point to any documentary support.  (Ex. C at p 48 ¶ 96)

78.   That the flyer attributed wrongdoing to Ms. Magee is not seriously disputable, but, to the extent there was any question it suggested serious wrongdoing, Ms. Cunningham acknowledged to the investigator that she had pushed to add red highlighted language on the flyer stating "Unethical behaviors?" and "Investigate these Individuals!"  (Ex. C at p. 48 ¶ 97; Ex. C – p. 45 Defamatory Flyer redacted version)

79.   Scores of community members saw the flyer at the meeting and it damaged their opinion of Ms. Magee.

80.   The injury was then compounded when Mr. Slaughter posted the investigator's report to ARPS' website.  The report included a version of the flyer that was only partially redacted, so that everyone with an internet connection could view the defamatory statements.

81.   Notably, Slaughter redacted the names of several people involved in the events underlying the report, but he did not completely redact Ms. Magee's name from the report, making it clear to readers that she was the person about whom the allegations of criminality and professional malfeasance had been made.

82.   Slaughter did so despite a high degree of awareness that Ms. Cunningham's allegations were fabricated.

83.   The version of the flyer accompanied by Ms. Magee's unredacted name remained on ARPS' website for 53 days, even after Ms. Magee implored Ms. Slaughter to remove her name from it or take down the image of the flyer.

84.   After almost two months of displaying Ms. Magee's name in tandem with the flyer, Mr. Slaughter finally relented and replaced the report with a version that had Ms. Magee's name redacted.

***Ms. Magee sought and obtained a right to sue letter from the Massachusetts Commission Against Discrimination.***

85.   On August 7, 2023, Ms. Magee timely filed a charge with the Massachusetts Commission Against Discrimination ("MCAD"), alleging harassment, discrimination, and retaliation under Title VII and c. 151B.

86.   Ms. Magee received a Right to Sue from MCAD on or about January 8, 2024.

87. On November 20, 2023, Ms. Magee timely filed a second charge with MCAD, alleging harassment, discrimination, and retaliation under Title VII and c.151B.

88. Ms. Magee received a Right to Sue Letter from MCAD on or about March 4, 2024.  (See Ex A - Right to Sue Letter)

89. Ms. Magee initiated this lawsuit prior to the statutory deadline of 90 days for both charges.

### Defendants locked Ms. Magee out of her email and unlawfully terminated her employment.

90. Just three days after Ms. Magee filed her first MCAD complaint, ARPS and Mr. Morris locked Ms. Magee out of her school email and terminated her employment at ARPS without any advance notice or process.

91. Ms. Magee promptly protested the dismissal as retaliatory, marshaling a host of evidence, and was soon reinstated.

92. A few months later, in November 2023, an ARPS administrator sent Ms. Magee an email notifying her that ARPS was rescinding her request for professional development leave, which it had granted in September 2023.

93. Ms. Magee is unaware of any protocol or rule authorizing such action by ARPS.  The timing of the rescission was especially upsetting because Ms. Magee had already taken leave.

### *ARPS and Mr. Slaughter continue retaliating against Ms. Magee after she files this lawsuit.*

94.   Even after Ms. Magee filed this lawsuit, ARPS and Mr. Slaughter continued retaliating against her.

95.   Prior to filing this lawsuit, Ms. Magee had been named as a highly qualified "first tier" finalist for that position.

96.   But, after Ms. Magee filed this lawsuit, Defendants offered the position to a white, "second tier" candidate who was objectively less qualified than Ms. Magee.

97.   Even after the less qualified, white candidate declined to accept the position, ARPS and Mr. Slaughter refused to hire Ms. Magee, despite ARPS' own Affirmative Action and Cultural diversity policy requiring that they do so.

98.   Adding insult to injury, Ms. Magee only learned that she was not selected on April 18, 2024 via Facebook, just 13 days after she filed this lawsuit.

### *Defendants' wrongdoing has substantially harmed Ms. Magee.*

99.   Defendants' discriminatory, harassing, and retaliatory conduct has severely harmed Ms. Magee.

100.  She has lost out on employment opportunities.

101.  She has had her reputation seriously denigrated in the eyes of many community members.

102. As a result of Defendants' acts, Ms. Magee now suffers from anxiety, fear, depression, insomnia, and extreme stress so severe she cannot even perform her work functions.

103. Consequently, Ms. Magee was forced to take medical leave on April 29, 2024, and is currently under treatment to manage the trauma caused by Defendants' conduct.

104. ARPS and Mr. Slaughter initially granted the leave without question.  After Ms. Magee filed this lawsuit, however, they purportedly converted the leave to disciplinary leave, for reasons they still have not explained and that appear to be connected to Ms. Magee's having filed this case.  Just one more retaliatory injury done to Ms. Magee, for which she now seeks redress.

## CAUSES OF ACTION

### COUNT I: DEFAMATION (AGAINST DOREEN CUNNINGHAM)

105. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

106. Doreen Cunningham prepared the defamatory flyer falsely charging, among other things, that Ms. Magee had a criminal record, had been involved in a notorious cheating scandal, and had been removed from an earlier job for misconduct.

21

107. All of those charges are false, and Ms. Cunningham published them knowing she had no evidentiary basis for them.

108. The charges in the flyer are defamatory per se because they impute to Ms. Magee the commission of crimes and charge her with unfitness to serve as a teacher.

109. Ms. Cunningham published the flyer to an unreasonably broad audience, including anyone who attended the May 16 ARPS committee meeting.

110. Ms. Cunningham published the statements knowing they would cause serious harm to Ms. Magee's reputation in the eyes of the community, and that is exactly what happened.

### COUNT II: DEFAMATION (AGAINST DOUGLAS SLAUGHTER)

111. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

112. Douglas Slaughter caused a written investigative report containing the defamatory flyer to be republished on ARPS' website, in a form that redacted the names of all persons appearing on the flyer except for Ms. Magee's.

113. ARPS' website prominently displayed the defamatory statements for nearly two months.

114. Despite Ms. Magee's repeated requests that Superintendent Slaughter remove the defamatory information or redact her name from the report,

Superintendent Slaughter refused to do so, causing the unredacted defamatory statement to remain on ARPS' website for an additional 53 days.

115.  While the defamatory flyer was eventually replaced with a redacted version, the extreme delay in doing so caused the false and defamatory information to remain accessible to the public for nearly two months.

116.  Superintendent Slaughter republished the false and defamatory statement in the flyer to the general public, despite knowing or recklessly disregarding that the flyer's allegations about Ms. Magee—including that she had a criminal record, had been involved in a cheating scandal, and had been removed from a previous job for misconduct—were false.

117.  By publishing the flyer online, to the entire world, Superintendent Slaughter unnecessarily, unreasonably, or excessively published it to others, including many who had no legitimate interest in knowing the information.

118.  The charges in the flyer are defamatory per se because they impute to Ms. Magee the commission of crimes and charge her with unfitness to serve as a teacher.

### COUNT III: RETALIATORY HARASSMENT IN VIOLATION OF 42 U.S.C. § 2000E-3(A) (AGAINST ARPS)

119.  Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

120. ARPS subjected Ms. Magee to adverse actions because she engaged in protected activity under Title VII of the Civil Rights Act of 1964.

121. Title VII protects employees who engage in the protected activities of complaining about or opposing discrimination from adverse actions which could reasonably dissuade an employee from engaging in protected activity.

122. ARPS' adverse actions against Ms. Magee included: posting defamatory flyers about her, publishing defamatory and confidential information about Plaintiff on ARPS' website, refusing to remove the defamatory information from ARPS' website for nearly two months, denying Ms. Magee promotions, terminating her employment, and rescinding or converting her previously acknowledged leave for unstated or impermissible reasons.

123. The adverse actions were sufficient to dissuade a reasonable person from complaining about or opposing discrimination in ARPS' workplaces.

124. ARPS subjected Ms. Magee to a pattern and practice of discriminatory and retaliatory conduct by supervisory-level employees, shortly following her complaints regarding discrimination, which could reasonably dissuade employees from complaining in the future.

125. The close proximity of time between the filing of Ms. Magee's discrimination action and her non-selection for the principal position supports a causal connection between her protected activity and adverse action.

126. ARPS' explanations for not selecting Plaintiff for promotional opportunities are pretext for retaliation, particularly given that Ms. Magee was denied promotions despite being objectively more qualified than other applicants.

### COUNT IV: RETALIATORY HARASSMENT IN VIOLATION OF M.G.L. C.151B (AGAINST ARPS)

127. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

128. ARPS subjected Ms. Magee to adverse actions because she engaged in protected activity under Massachusetts General Laws c.151B, which prohibits "any person" (not merely a supervisor or employer) from taking adverse action against a person "because he has opposed any practices forbidden under [Chapter 151B] or because he has filed a complaint, testified or assisted in any proceeding under [Chapter 151B]." [M.G.L. Ch. 151B, Sect. 4(4)] The same chapter provides that no person may "coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by this chapter." M.G.L. c. 151B, Sect. 4(4A).

129. Ms. Magee engaged in the protected activities of complaining about and opposing discrimination.

130. She was subsequently subjected to adverse actions that could reasonably dissuade an employee from engaging in protected activity.

131. The adverse actions to which ARPS subjected Ms. Magee include: posting defamatory flyers about Ms. Magee, publishing defamatory and confidential information about Ms. Magee on ARPS' website, refusing to remove the defamatory information from ARPS' website for nearly two months, refusing to meet with Ms. Magee in circumstances where doing so was necessary for her job, rejecting her job applications, rescinding her professional development leave, denying her an education team leader position, locking her out of the email system, denying her promotion to an administrator, and terminating her employment.

132. The adverse actions were sufficient to dissuade a reasonable person from complaining about or opposing discrimination in ARPS' workplace.

### COUNT V: RACIAL DISCRIMINATION IN VIOLATION OF M.G.L. C.151B (AGAINST ARPS)

133. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

134. Massachusetts General Laws chapter 151B prohibits discrimination in hiring and promotions on the basis of race.

135. ARPS denied Ms. Magee job opportunities in favor of less qualified white applicants.

136. ARPS violated its non-discrimination and affirmative action policies by denying Plaintiff for job opportunities in favor of less qualified white applicants.

137. ARPS' explanations for not selecting Plaintiff for promotions are pretext for discrimination and retaliation.

### COUNT VI: RETALIATORY HARASSMENT IN VIOLATION OF M.G.L. C.151B (AGAINST MICHAEL MORRIS AND DOUGLAS SLAUGHTER)

138. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

139. Massachusetts General Laws chapter 151B allows for individual liability for harassment and other unlawful practices by employers.

140. Defendants Michael Morris and Douglas Slaughter subjected Ms. Magee to a pattern and practice of discriminatory and retaliatory conduct by supervisory-level employees shortly following her complaints regarding discrimination, which could reasonably dissuade employees from complaining in the future.

141. Mr. Morris and Mr. Slaughter, individually and through various employees, supervisors and agents of its school district, retaliated against Ms. Magee for her protected activities. They subjected Ms. Magee to a steady barrage of adverse actions that would dissuade a reasonable employee from complaining about discrimination in the future.

142. There is a close temporal proximity between Ms. Magee's protected activity and Mr. Morris's and Mr. Slaughter's adverse actions, supporting a causal connection for her retaliation claims.

143. The pervasive and blatantly retaliatory conduct constitutes the kind of dissuasive actions expressly prohibited by the anti-retaliation provisions 151B and ARPS' Non-Retaliation policy.

### COUNT VII: RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 AND THE FIRST AMENDMENT (AGAINST ALL DEFENDANTS)

144. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

145. The First Amendment protects employees from retaliation by government entities when employees have engaged in speech that is a matter of public concern.

146. Ms. Magee repeatedly spoke up to Defendants on matters of public concern—including discrimination, retaliation, violation of school policies, and other misconduct by school officials.

147. She spoke to Defendants as a representative of the teachers union, not merely to vindicate her personal interests, but to address issues of systemic discrimination and persistent misconduct within ARPS and that implicated others affiliated with ARPS. Oftentimes, she spoke up because these issues had been called to her attention by other ARPS employees or by students.

28

148. Defendants were all government actors, or acted in concert with government actors.

149. Defendants subjected Ms. Magee to adverse actions because of her protected speech, including posting defamatory flyers about Ms. Magee, publishing defamatory and confidential information about Ms. Magee on ARPS' website, refusing to remove the defamatory information from their website for nearly two months and terminating Ms. Magee's employment.

150. Defendants perpetrated these adverse actions under color of law.

151. Defendants' actions deprived Ms. Magee of her right to free speech, as protected by the First Amendment and 42 U.S.C. § 1983.

### COUNT VIII: BREACH OF CONTRACT (AGAINST DOREEN CUNNINGHAM)

152. Ms. Magee incorporates by reference the above paragraphs, as if fully stated herein.

153. To facilitate its search for a new principal, ARPS required members of the search and hiring committee to sign a contract precluding them from disclosing information obtained during the search.

154. Ms. Cunningham signed such a contract with ARPS.

155. The confidentiality agreement in that contract was intended to benefit and protect applicants, like Ms. Magee.

156. As an intended beneficiary of that contract, Ms. Magee had a reasonable expectation of privacy regarding her candidacy.  She applied for the open principal position in reliance on it.

157. Ms. Cunningham had read and understood the terms of the agreement, and accepted its terms when she signed the agreement.

158. Ms. Cunningham breached the agreement when she failed to adhere to its terms, including by disclosing at a well-attended committee meeting that Ms. Magee had applied for and not been hired for the principal position.

159. Ms. Magee suffered substantial humiliation as a result of the broad public disclosure of that fact, which is what Ms. Cunningham intended.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that process is issued according to law and demands judgment against Defendants as follows:

a.      All damages that may be awarded under the Title VII, including lost wages and back pay; general compensatory damages for retaliation including but not limited to damages for mental anguish and emotional distress; and liquidated damages;

b.      All damages that may be awarded under M.G.L. c.151B for discrimination and retaliation provided for under Massachusetts law;

       c.     All damages that may be awarded for defamation and breach of contract under Massachusetts law;

       d.     Special damages to the extent allowed by law;

       e.     Injunctive relief under Title VII preventing and prohibiting ARPS and Slaughter from persisting in their retaliatory and discriminatory conduct against Ms. Magee; as well as damages under Title VII for lost wages based on retaliatory conduct;

       f.     Reasonable attorney's fees and expenses and costs pursuant to 42 U.S.C. § 1988;

       g.     Such other and further and different relief as this court deems just and appropriate.

Respectfully submitted, the 11th day of July 2024.


/S/ Arnold J. Lizana
Law Offices of Arnold J. Lizana III
MA BBO No. 546161
1175 Peachtree Street NE, 10th Floor
Atlanta, GA 30361
T: (404) 207-1559
F: (470) 231-0672
alizana@attorneylizana.com

**ATTORNEY FOR PLAINTIFF**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

LAMIKCO TWANET MAGEE

     Plaintiff,

v.

AMHERST-PELHAM REGIONAL PUBLIC
SCHOOLS and individually
MICHAEL MORRIS,
and DOREEN CUNNINGHAM, and
DOUGLAS SLAUGHTER


     Defendant.

Civil Action No.

3:24-cv-30049-MGM

Jury Trial Demanded

## **CERTIFICATE OF SERVICE**

The undersigned, counsel for Plaintiff Lamikco Twanet Magee in the above

civil action, hereby certifies that he has this day served all parties with a copy of

the foregoing Plaintiff's SECOND AMENDED COMPLAINT by electronic mail

and mailing same, properly stamped and addressed as follows:

       Hunter S. Keil, Esq.
       Robinson Donovan, P.C.
       1500 Main Street - Suite 2300
       PO Box 15609
       Springfield, MA  01115-5609
       hkeil@robinsondonovan.com

33

Jeff Trapani
Pierce Davis & Perritano LLP
10 Post Office Square
Suite 1100N
Boston, MA 02109
jtrapani@piercedavis.com
**ATTORNEYS FOR DEFENDANTS**


This 11 day of July, 2024

          s/Arnold J. Lizana, III
          Arnold J. Lizana, III
          Attorney for Plaintiff

1175 Peachtree Street NE, 10th Floor
Atlanta, GA 30361